UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JEFFREY AARON, #275291,

               Petitioner,

                                   CASE NO. 2:11-CV-11147
v.                                HONORABLE VICTORIA A. ROBERTS

DEBRA SCUTT,

               Respondent.
_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.**      **Introduction**

      Michigan prisoner Jeffrey Aaron ("Petitioner") filed a pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, asserting that he is held in violation of his constitutional rights. An Oakland County Circuit Court jury convicted Petitioner of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), and assault with intent to commit sexual penetration, MICH. COMP. LAWS § 750.520(g)(1). He was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to concurrent terms of 60 to 90 years imprisonment.

      Petitioner raises claims concerning a perceived violation of the Interstate Agreement on Detainers Act ("IAD") and Michigan's "180-Day Rule," the adequacy of the criminal investigation, the effectiveness of trial and appellate counsel, the sufficiency of the evidence, and the conduct of the prosecutor.

      The Court finds that Petitioner is not entitled to federal habeas relief and denies the petition.

The Court also denies a certificate of appealability and denies leave to proceed *in forma pauperis* on appeal.

II.     **Facts and Procedural History**

Petitioner's convictions arise from his assault upon a woman named Norma Romero in her bedroom at an apartment complex in Pontiac, Michigan during the early morning hours on July 12, 2003. Petitioner fled Michigan following the incident, but was subsequently arrested and convicted of unrelated crimes in Florida and returned to Michigan in September, 2004.

On July 27, 2005, prior to trial, Petitioner filed a motion to dismiss, alleging a violation of the IAD and Michigan's 180-Day Rule. The IAD is an agreement between 48 states, the Federal Government, and the District of Columbia. *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001). As explained by the United States Court of Appeals for the Sixth Circuit:

> The purpose of the agreement is to establish 'cooperative procedures' to 'encourage the expeditious and orderly disposition' of charges outstanding in one jurisdiction against a prisoner who is 'already incarcerated' in another jurisdiction. 18 U.S.C. App. 2, § 2, art. I. The IAD facilitates the transfer of prisoners 'to the receiving State for trial prior to the termination of his sentence in the sending State,' and 'it seeks to minimize the consequent interruption of the prisoner's ongoing prison term.' *Bozeman*, 533 U.S. at 148, 121 S. Ct. 2079.

*Jenkins v. United States*, 394 F.3d 407, 412-13 (6th Cir. 2005). The IAD in Michigan requires that a prisoner in another state who has a detainer lodged against him/her be brought to trial within 180 days of providing notice of his/her place of confinement to the prosecutor's office or within 120 days of arrival in the state. Mich. Comp. Laws § 780.601. Michigan's 180-Day Rule requires that an incarcerated inmate be tried within 180 days after corrections officials deliver written notice of the inmate's place of imprisonment to the prosecutor's office. Mich. Comp. Laws § 780.131. Failure to comply with either provision, as applicable, results in dismissal of the charges. Mich.

2:11-cv-11147-VAR-LJM   Doc # 9   Filed 11/26/13   Pg 3 of 32   Pg ID 1203

COMP. LAWS §§ 780.601, 780.133.

The trial court conducted an evidentiary hearing on August 31, 2005. At that hearing, Michigan parole agent Michael Perilloux testified that Petitioner was paroled on December 3, 2001. A condition of Petitioner's parole was that he could not leave Michigan without permission. Petitioner also signed an agreement waiving extradition. On or about July 17, 2003, Perilloux learned that the Pontiac Police Department had new charges against Petitioner. He issued a warrant for Petitioner as a parole absconder.

Petitioner was arrested in Florida on unrelated criminal charges on July 25, 2003. He pleaded no contest to those charges on August 25, 2004 and was sentenced to 10 years imprisonment with credit for time served, to be served concurrently to any sentence imposed in Michigan. Petitioner was returned to Michigan for a parole violation September 23, 2004. A preliminary hearing on the parole violation was held in October, 2004.[1] A parole revocation hearing was held on November 8, 2004. Petitioner was found guilty of violating his parole and received a 24-month continuance on December 15, 2004.

Michigan Department of Corrections IAD Administrator Cheryl Arwood testified that she was not involved in Petitioner's case because the IAD did not apply. She explained that Petitioner was brought back to Michigan on a parole violation for a prior conviction and that the IAD was not utilized to return him to state custody. She further explained that the Michigan Department of Corrections does not utilize the IAD; the county prosecutor must initiate it.

Michigan Department of Corrections Parole Supervisor Judy Bishop testified that she learned

---

[1]According to Petitioner, he was also formally charged with the criminal offenses at issue in this case in October, 2004.

3

that Petitioner was arrested in Florida on July 25, 2003, but he could not be returned to Michigan until he posted bond or was sentenced on that case. She confirmed that Petitioner was brought back to Michigan as a parole violator.

Pontiac Police Detective Jody Kendrick was called by the defense. She testified that an arrest warrant was issued for Petitioner on July 18, 2003. She never put a hold on Petitioner while he was in Florida, but did have contact with Florida to confirm the Michigan warrants.

Following the hearing, the trial court ruled that Petitioner was not brought back to Michigan under the IAD such that there was no violation of the IAD. The court also ruled that the delays in bringing the case to trial were for good cause and there was no violation of Michigan's 180-day rule. The case was set for trial.

The trial commenced on September 1, 2005. The Court adopts the summary of the trial testimony set forth by defense counsel on direct appeal to the extent it is consistent with the record. Those facts are as follows:

> Norma Romero testified that on July 11, 2003, she lived at an apartment at 327 S. Telegraph Road in the City of Pontiac (T 89-90). It was a two bedroom ground floor apartment that [she] shared with Candelario Reyes and Ivan Delao (T 90).
> In the early morning hours of July 12, 2003, Romero was sleeping in her bedroom with the television and lights on when a person came into her room and told her to be quiet by putting his index finger across his mouth (T 93-94). Romero alleged that the person was defendant Jeffrey Aaron (T 93).
>
> She claimed that Mr. Aaron grabbed the phone from her hands and then told her to shut up and not to scream (T 94). Romero told Mr. Aaron that her money was in her purse, however she claimed that Mr. Aaron got on the bed and straddled her while she lay on her back (T 95). Romero alleged that Mr. Aaron began hitting her with his fists in her face and then unplugged the bedside lamp and started hitting her with it (T 96). She claimed that Mr. Aaron began choking her with the lamp's cord while she struggled with him (T 97-98). She also alleged that Mr. Aaron put a pillow over her head to stop her from screaming (T 111).
>
> Romero testified that she managed to roll over onto her stomach at which point Mr.

4

Aaron began rubbing himself on her (T 98). She fell off the bed and onto the floor while Mr. Aaron continued choking her with the lamp's cord (T 100). During the fall Romero broke her right arm (T 103). At that point, Candelario Reyes arrived home and Romero stated that Mr. Aaron fled the room (T 103). She testified that the whole incident took place over 30 to 40 minutes and that she was transported to North Oakland Medical Center by EMS (T 104, 114). The prosecution reviewed various photos of Ms. Romero and the injuries sustained (T 104-5). Ms. Romero noted that she scratched the attacker's face with her long fingernails, but no scrapings were taking from under the nails by police (T 143-45).

Romero testified that the front door to the apartment had been locked but the window screen in the bedroom shared by Reyes and Delao had been removed (T 111). Romero identified Mr. Aaron as someone who lived in the same apartment building and told detectives two days later that it was him (T 112, 131-33, 149). Romero picked Mr. Aaron from a photographic line up (T 133). She could not remember what clothing Mr. Aaron wore during the alleged attack, including the cap placed into evidence by the prosecution that was found in her bedroom (T 115-18, 142)

Romero indicated that she told Candelario to clean up her sheets and bedroom after the incident before the police had an opportunity to examine the room (T 134, 145). She claimed that she felt the room was dirty and never returned to the apartment after this incident (T 134). The police recovered some of the clothes she wore that night from the apartment complex dumpster (T 152) The t-shirt she was wearing was thrown out (T2 95-96).

Candelario Reyes Cabrera (hereinafter "Reyes" to differentiate from his cousin) testified that he lived with Ivan Cabrera, his cousin, and Norma Romero at the time of this incident (T2 9-11). Reyes indicated that the two men shared one bedroom while Romero had the other (T2 12). Reyes and Cabrera were working on the night of July 11, 2003 until midnight (T2 12). The two men got off work around 12:15 a.m. and went to Steak and Shake for something to eat (T2 12-13).

Reyes testified that the two men then returned to the apartment (T2 13). Ivan remained outside to smoke a cigarette and Reyes went inside and saw that Romero's bedroom door was semi-closed and that it was dark inside (T2 14). Reyes went into his bedroom but heard a noise coming from Romero's room (T2 14-15, 30). He pushed the door open and was trying to see if someone was inside when suddenly a person pushed past him and ran toward the apartment exit (T2 15, 31). Reyes went inside the bedroom and saw Romero on the floor next to the bed covered in blood with the lamp cord around her neck (T2 16).

Reyes claimed that the person who ran out of the apartment was the defendant, Jeffrey Aaron (T2 17-18). He testified that he had seen Mr Aaron approximately ten

5

to fifteen times around the apartment complex (T2 18). Reyes picked Mr. Aaron out of a photographic line up (T2 28).

Reyes indicated that their apartment was on the first floor and that the screen in his bedroom window and been taken down (T2 19-20). Reyes called Romero's brother, Jose Romero, who then dialed EMS to the apartment (T2 21). Reyes testified that he went to the hospital to be with Norma Romero, then went with police back to the apartment around 3:30 a.m. (T2 23-24). Reyes stated that the keys and hat found in Norma's bedroom did not belong to any of the people living there (T2 24). He noted the police took the lamp cord, and later took fingerprints, the lamp, and sheets (T2 27). Reyes noted that the three moved out of the apartment a week later (T2 27).

Ivan Cabrera testified consistently with his cousin, Candelario Reyes Cabrera (T2 40). Cabrera acknowledged that he remained outside of the apartment to smoke and heard his cousin's shout a few minutes later (T2 43). He identified defendant Jeffrey Aaron as the man who ran out of the apartment (T2 44). Cabrera claimed that he knew it was Mr Aaron because he lived in the same building (T2 45). Cabrera also picked Mr. Aaron out of a photographic line up (T2 48-49).

William Serote, MD was qualified as an expert in emergency medicine and testified that he was the doctor that treated Ms. Romero in the early hours of July 12, 2003 (T 121-23). Dr. Serote had no independent recollection of Ms. Romero and read from his report frequently during his testimony (T 123).

Officer Roy Johnson of the Pontiac Police Department testified that in the following days from the incident, a suspect developed (T2 60-62). He noted that the keys found in Romero's bedroom did not operate the locks on Lennetta Carlis' apartment (T2 62). Johnson contacted the maintenance man and was told that the locks on Carlis' apartment had recently been changed (T2 64). Johnson was informed that the old locks were still in the maintenance facility (T2 64). He claimed that the keys found at the scene operated the old locks to Carlis' apartment (T2 64). A search warrant for Carlis' apartment was then obtained (T2 69).

David Stroman testified that he was the maintenance supervisor of the apartment complex and that he assisted the police in their investigation regarding the locks on the apartment of Linnetta Carlis on July 16, 2003 (T2 73-74). Stroman claimed that he never saw Mr. Aaron after he changed the locks on July 14 (T2 76, 78, 85). He alleged that he put the old locks in a trash can in the basement (T2 78). Stroman admitted that he changed the locks on Carlis' apartment on several occasions (T2 86).

Jose Romero Romualdo testified that on July 12, 2003, he received a phone call from Candelario Reyes regarding his sister at approximately 1:30 a.m. (T2 89-90). Romualdo drove the apartment and EMS was already there (T2 91). He went to the

hospital and returned to the apartment three or four days later to remove all of his sister's belongings (T2 92).

Jaclyn Martindale of the Pontiac Police Department testified that she was the crime scene investigator dispatched to the scene (T2 97-98). Martindale testified to the floor plan and layout of the apartment, including utilizing numerous pictures (T2 102, 105-6). She noted that the screen was removed from the second bedroom window (T2 104).

Photographs of Norma Romero were admitted into evidence along with the fitted sheet (T2 116-123). Latent prints and blood samples were taken from the scene (T2 123-29). None of the usable fingerprints lifted at the scene belonged to Mr. Aaron (T2 130, 135). The blood samples were not DNA tested (T2 130). The hair from the hat found in Romero's bedroom belonged to a Caucasian person (T2 140). Martindale admitted that there was no physical evidence linked to Mr. Aaron found at the scene (T2 141).

On September 6, 2005, jury trial continued with the testimony of Linnetta Carlis. Carlis testified that Mr. Aaron was her boyfriend and that they had a son together with another child on the way at time of trial (T3 7). She had known Mr. Aaron for approximately 12 years and had been living with him at the Bloomfield on the River Apartments (T3 5). While Mr. Aaron was not a signee to the lease on the apartment, the lease noted that he did live there with Ms. Carlis (T3 6).

Carlis testified that during the early morning hours of July 12, 2003. she saw that EMS had been called to the building (T3 10-11). Police officers came to her door and told her that they were looking for a black male that lived in the apartment complex (T3 12-13). Carlis spoke with Detective Frances Finnegan several days later and was told that the police were looking for Mr. Aaron (T3 13-15). Carlis told Finnegan that she had not seen Mr. Aaron since the night of the incident when he had come over to see his son (T3 16, 22-23).

Carlis stated that Mr. Aaron was not living at the apartment and did not have keys to the apartment at the time (T3 18, 23, 31). Carlis had the door locks replaced because she had misplaced her keys (T3 17-18). She testified that keys found in Romero's bedroom were not hers, because her keys were on a specific key chain (T3 22). Carlis stated that she did not know Ms. Romero (T3 25).

Detective Jody Kendrick of the Pontiac Police Department testified that she was the Officer in Charge of this case and that she had taken Ms. Romero back to the apartment several days later to go over the scene and incident (T3 32-36). Kendrick opined that entry to the apartment was gained by forcing the window in the second bedroom (T3 36). Additional evidence was collected from the apartment and Kendrick spoke with the maintenance man, Mr. Stroman (T3 37). Kendrick claimed

7

that the keys found in Romero's bedroom fit the locks from Carlis' apartment that had been recently changed but saved in the maintenance room (T3 38). Kendrick noted that both Reyes and Cabrera identified Mr. Aaron from a photographic line up (T3 40). Kenndrick admitted that no DNA tests were run on the blood samples and that the only hair found on the hat recovered from Romero's room was a Caucasian hair thereby ruling out Mr. Aaron (T3 41). The keys were not checked for fingerprints nor were fingernail scrapings taken from Ms. Romero even though she informed several police officers that she deeply scratched the perpetrator's face (T3 42).

Officer Derrick Lee testified that he was on duty in the early morning hours of July 12, 2003, and that he was dispatched to the scene around 1:45 a.m. (TJ 52-53). When he arrived at the scene, EMS was already present and he saw that Ms. Romero had sustained numerous injuries (T3 53). At the scene, Romero referenced a lady in the apartment building as the wife of the attacker (T3 55).

Lee went to the hospital to ask Romero more questions then returned to Apartment 5 to question Linnetta Carlis (T3 57). Lee claimed Ms. Carlis was evasive and told him that Mr. Aaron did not live there and had not been there that day (T3 58, 68). Lee next went to Romero's apartment and recovered the lamp cord which had blood on it, and a baseball cap that he was told did not belong to Ms. Romero (T3 50-61). Lee noted that the window screen in the second bedroom had been removed (T3 62).

Pet. App. Brf., pp. 2-9 (footnote omitted, punctuation added).

Petitioner did not testify at trial. At the close of trial, the jury convicted him of the charged offenses of assault with intent to commit murder, first-degree home invasion, and assault with intent to commit sexual penetration. The trial court subsequently sentenced him as a fourth habitual offender to concurrent terms of 60 to 90 years imprisonment.

Following sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising claims concerning perceived violations of the IAD and Michigan's 180-day rule, and the adequacy of the criminal investigation. The Michigan Court of Appeals denied relief on those claims and affirmed his convictions. *People v. Aaron*, No. 268040, 2007 WL 1687554 (Mich. Ct. App. June 12, 2007) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Aaron*, 480 Mich. 1134,

8

745 N.W.2d 777 (2008).

Petitioner subsequently filed a motion for relief from judgment with the state trial court raising claims concerning the sufficiency of the evidence, the effectiveness of trial and appellate counsel, the conduct of the prosecutor, cumulative error, and additional claims regarding the police investigation. Citing Michigan Court Rule 6.508(D)(3), the trial court ruled that Petitioner was not entitled to relief and denied the motion. *People v. Aaron*, No. 2005 203022 FC (Oakland Co. Cir. Ct. April 16, 2009) (unpublished). The trial court also denied reconsideration. Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, which was denied because Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Aaron*, No. 297201 (Mich. Ct. App. Aug. 11, 2010) (unpublished). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Aaron*, 488 Mich. 1046, 794 N.W.2d 579 (2011).

Petitioner thereafter filed his federal habeas petition raising the following claims:

I.   Speedy trial - Petitioner asserts that his right to a speedy trial has erroneously [been] ruled against by the state courts, as the State did not have the right information to rule on, as the prosecutor stated that Petitioner's [right] was not violated as the Petitioner was an absconder and the 180-day rule does not apply to an absconder, violating the Fourth, Fifth, and Sixth Amend[ments].

II.  Failure to investigate - Petitioner contends that his constitutional right to due process has been violated.

III. Ineffective assistance of trial and appellate counsel violating [the] Fourteenth and Sixth Amendments.

IV.  Sufficiency of evidence 28 U.S.C. § 2254(D)(1).

V.   Prosecutor misconduct.[2]

---

[2]Petitioner lists a sixth issue in his pleadings, but it is merely an argument that the state court decisions were unreasonable, not a separate claim for habeas relief.

Respondent answered the petition, contending that it should be denied because the claims lack merit and/or are barred by procedural default.

**III.     Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the following standard of review for federal habeas cases filed by state prisoners:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

A state court's decision is contrary to clearly established law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.

10

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme

Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's decision. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV.    Discussion

### A.    Procedural Default

As an initial matter, Respondent contends that some of Petitioner's claims are barred by procedural default. It is well-settled, however, that federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The United States Supreme Court explained the rationale behind such a policy: "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the procedural issues are intertwined with the merits of Petitioner's issues and the substantive issues are easier to resolve. Accordingly, the Court proceeds to the merits of Petitioner's claims.

### B.   The IAD, Michigan's 180-Day Rule, Speedy Trial

Petitioner asserts that he is entitled to habeas relief due to perceived violations of the IAD and Michigan's 180-day rule. Respondent contends that this claim is not cognizable on federal habeas review and/or lacks merit, and that Petitioner's federal speedy trial rights were not violated.

The Michigan Court of Appeals denied relief on this claim on direct appeal. The court ruled that the IAD was not violated because Petitioner was not placed on a detainer, because Petitioner was a parolee who was returned to Michigan on a parole violation, and because Petitioner did not comply with the IAD's notice provisions. The court further ruled that Michigan's 180-day rule was not violated because the prosecutor did not receive notice of Petitioner's incarceration so as to trigger the 180-day period and/or because Petitioner was tried within 180 days of his parole revocation once excusable delays and delays not attributable to the prosecution are considered. *Aaron*, 2007 WL 1687554 at *1-2.

13

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. First, Petitioner is not entitled to relief under the IAD. The United States Court of Appeals for the Sixth Circuit has held that alleged violations of the IAD are not cognizable on federal habeas review, absent a fundamental defect that results in a complete miscarriage of justice. *See Browning v. Foltz*, 837 F.2d 276, 283 (6th Cir. 1988) (violations of the IAD do not provide a basis for habeas relief under § 2254); *Metheny v. Hamby*, 835 F.2d 672, 673-75 (6th Cir. 1987) (state prisoner's claim that state had violated trial-before-return provision of IAD was not fundamental defect cognizable in federal habeas proceeding under 28 U.S.C.§ 2254, absent exceptional circumstances); *see also Curtis v. United States*, 123 F. App'x 179, 184-85 (6th Cir. 2005) (federal prisoner not entitled to habeas relief under § 2241 on claim that United States violated IAD by failing to seek his return from state custody, absent resulting complete miscarriage of justice). Petitioner makes no such showing. Moreover, the IAD is inapplicable to the case at hand because Petitioner was returned to Michigan as a parole violator who had waived extradition, not pursuant to a detainer under the IAD.

Second, Petitioner is not entitled to habeas relief on any claim that the trial court violated Michigan's 180-day rule. It is well-established that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). Thus, to the extent that Petitioner contends that Michigan's 180–day rule was violated, he is not entitled to federal habeas relief. *See Burns v. Lafler*, 328 F. Supp. 2d 711, 722 (E.D. Mich. 2004) (denying habeas relief on similar claim).

Third, Petitioner fails to demonstrate a violation of his federal speedy trial rights. The Sixth Amendment to the United States Constitution provides a criminal defendant with the constitutional

14

right to a speedy trial.  U.S. CONST. AMEND. VI.  To determine whether a speedy trial violation has occurred, a reviewing court must consider the following four factors:  (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy trial right, and (4) the prejudice to the defendant.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  No single factor is determinative; rather a court must weigh the factors and engage in a "difficult and sensitive balancing process" to determine whether a constitutional violation has occurred.  *Id*. at 533.  The right to a speedy trial "is 'amorphous,' 'slippery,' and 'necessarily relative.'"  *Vermont v. Brillon*, _ U.S. _, 129 S. Ct. 1283, 1290 (2009) (citation omitted).  That being said, the length of delay is a "triggering factor" because "until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Barker*, 407 U.S. at 530.  Thus, to trigger a speedy trial analysis, a defendant must allege that the interval between accusation and trial has crossed the line between ordinary delay and presumptively prejudicial delay.  *Doggett v. United States*, 505 U.S. 647, 651-52 (1992).  Courts have generally found delays of one year or more to be "presumptively prejudicial."  *Id*. at 652, n. 1.

Additionally, the Due Process Clause of the Fifth Amendment to the United States Constitution prohibits unjustified pre-indictment or pre-arrest delay.  *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *United States v. Marion*, 404 U.S. 307, 324-26 (1971).  To prevail on such a claim, a defendant must show substantial prejudice to his right to a fair trial and intent by the prosecution to gain a tactical advantage.  *Marion*, 404 U.S. at 324; *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992).

Petitioner cannot prevail under either constitutional provision.  He cannot establish a Sixth Amendment speedy trial violation because the delay between formal criminal charges and trial was

15

less than one year and was not presumptively prejudicial.  According to Petitioner, he was formally charged with the criminal offenses at issue in October, 2004.[3]  His trial commenced on September 1, 2005.  That period of time is less than the one-year delay necessary to justify an inquiry into the other factors.  Moreover, those factors do not support his claim.  First, a portion of the delay was attributable to the defense and the prosecutorial delay was due to the victim's location out of state and her medical needs, not to gain a tactical advantage.  Second, Petitioner did not assert his speedy trial rights until July, 2005 when he filed a motion to dismiss the charges.  Third, Petitioner has not shown that he was prejudiced by the trial delay.

Petitioner cannot establish a Fifth Amendment due process violation for pre-indictment delay because he has not shown prejudice arising from the delay, or that the prosecution delayed the proceedings to gain a tactical advantage.  Rather, the record indicates that Petitioner was in custody on the Florida charges from late July, 2003 until he was returned to Michigan on September 23, 2004.  He was then in custody on his Michigan parole violation from that date until his trial commenced on September 1, 2005.  He does not allege that any witnesses or evidence were lost due to the delay.  The record also reveals that much of the delay was due to Petitioner's flight from Michigan, his criminal charges and incarceration in Florida, and the victim's location out of state and inability to travel due to her medical needs.  Given such circumstances, Petitioner fails to establish a violation of his federal constitutional rights.  Habeas relief is not warranted.

## C.    Adequacy of the Criminal Investigation

Petitioner asserts that he is entitled to habeas relief because the police and prosecutor failed

---

[3]His pleadings on direct appeal and before this Court indicate dates of either October 4, 2004 or October 22, 2004.

16

to fully investigate the crime.  In particular, he asserts that they failed to perform DNA testing on blood samples found at the scene, did not preserve evidence, and failed to consider and investigate other suspects.

The failure of police to preserve potentially useful evidence for a defendant is not a denial of due process of law unless the defendant can show bad faith on the part of police.  *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam).  When the state fails to preserve evidentiary material "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a defendant must show:  (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means.  *Monzo v. Edwards,* 281 F.3d 568, 580 (6th Cir. 2002).

A habeas petitioner has the burden to establish that the police acted in bad faith in failing to preserve potentially exculpatory evidence.  *Malcum v. Burt,* 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003).  The mere fact that the police had control over evidence and failed to preserve it is insufficient, by itself, to establish bad faith, nor will bad faith be found in the government's negligent failure to preserve potentially exculpatory evidence.  *Id.*  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."  *Youngblood*, 488 U.S. at 56.  Further, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied."  *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

17

The Michigan Court of Appeals denied relief on this claim, stating:

Defendant also argues on appeal that his constitutional right to due process of law was denied by the Pontiac Police Department's failure to fully investigate the crime. He specifically finds fault with the department's decision not to perform DNA testing on various blood samples taken at the scene, not to fully investigate, and not to consider other suspects. We disagree.

At the outset, we note that the issue related to DNA testing is waived. Defendant objected below to the prosecution's request for a continuance to allow for DNA testing of the blood samples. He specifically stated that he was making a strategy decision to oppose the adjournment because he did not wish to risk the possibility that additional evidence against him would be discovered. Defendant may not claim an action is error if he contributed to the error by plan or negligence, *Phinney v. Perlmutter*, 222 Mich. App. 513, 537; 564 N.W.2d 532 (1997), and a defendant may not advocate a position before the trial court and argue on appeal that the decision in his favor was error. *People v. Aldrich*, 246 Mich. App. 101, 111; 631 N.W.2d 67 (2001).

Next, we find no merit in defendant's claim that he was denied due process. The prosecutor's duty to disclose evidence does not require that the prosecutor has a duty to investigate all other possible suspects, and there is a clear distinction between the prosecutor's duty to disclose evidence to the defendant and a duty to develop evidence for the defendant. *People v. Coy*, 258 Mich. App. 1, 22; 669 N.W.2d 831 (2003). A prosecutor is not required to "seek and find exculpatory evidence" or assist in building the defendant's case, and it is not required to "negate every theory consistent with defendant's innocence." *Id*. at 21. Unless the defendant can show the suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to perform DNA testing to satisfy due process. *Id*. In addition, unless defendant can show bad faith, the police's failure to preserve evidence does not violate due process. *Arizona v. Youngblood*, 488 U.S. 51, 58; 109 S. Ct. 333; 102 L. Ed. 2d 281 (1988).

Defendant has not alleged that police acted in bad faith, or that they intentionally destroyed or suppressed evidence. He asserts only that the department was negligent in its investigation. After reviewing the testimony, we conclude that there is no evidence of bad faith or intentional misconduct, although the department appears to have been negligent in not timely investigating and preserving all potential evidence. Because there is no evidence of bad faith, defendant's right to due process was not violated by the police's failure to perform DNA testing, preserve other potential evidence, or conduct a more complete investigation.

*Aaron*, 2007 WL 1687554 at *3-4.

This decision is neither contrary to Supreme Court precedent nor an unreasonable application of the law or the facts. Petitioner fails to show that the police acted in bad faith in failing to preserve any evidence. The mere fact that the police may have been negligent – or even grossly negligent – in investigating the crime scene is insufficient to show that the police acted in bad faith. Additionally, Petitioner cites no clearly established law that the police or prosecution had a constitutional obligation to investigate the DNA evidence or other potential suspects. *See generally Ridder v. City of Springfield*, 108 F.3d 1377, 1997 WL 117024, *2 (6th Cir. 1997) (dismissing civil rights claim where plaintiff failed to demonstrate what clearly established law created a duty for a police officer to conduct an alibi investigation in a particular manner). In fact, case law holds that once the police have sufficient probable cause to arrest, they need not investigate further. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 308 (6th Cir. 2005) (citing cases). Even under state law principles, neither the police nor the prosecutor have an affirmative duty to investigate on a defendant's behalf, or to seek and find exculpatory evidence. *People v. Burwick*, 450 Mich. 281, 537 N.W.2d 813, 816 n. 10 (Mich. 1995); *People v. Sawyer*, 222 Mich. App. 1, 564 N.W.2d 62, 65 (1997). Accordingly, this Court cannot conclude that the conduct of the police or the prosecution deprived Petitioner of a fundamentally fair trial. Habeas relief is not warranted on this claim.

### D.   Effectiveness of Trial and Appellate Counsel

Petitioner says he is entitled to habeas relief because trial and appellate counsel were ineffective. He alleges that trial counsel was ineffective for failing to seek DNA testing, for failing to meet with him, investigate his case, interview witnesses, and prepare a defense, and for failing to raise pertinent issues. He alleges that appellate counsel was ineffective for failing to raise the

19

claims raised in his motion for relief from judgment on direct appeal in the state courts. Respondent contends that these claims are barred by procedural default and lack merit.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

On collateral review, the trial court cited the *Strickland* standard and determined that trial counsel's decision not to pursue DNA testing was sound trial strategy and that counsel "performed admirably." The court found "no deficiency" in the performance of both trial and appellate counsel and denied relief on the claims. *Aaron*, No. 2005 203022 FC at *3-4. The court also denied reconsideration as to these issues, stating that "trial and appellate counsel performed well above the objective standard of reasonableness and that [Petitioner] has not identified errors that might have led to a different result." 9/25/09 Opinion and Order. The Michigan appellate courts denied leave to appeal.

The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[4] Petitioner claims that trial counsel was deficient for failing to seek DNA testing, specifically for objecting to a continuance so that the prosecution could do DNA testing on blood found at the scene. Counsel's decision to forego those tests and proceed to trial was a matter of trial strategy and was reasonable, given the victim's and

---

[4]The Court would reach the same result under a *de novo* standard of review.

the roommates' identifications of Petitioner as the perpetrator. Counsel may have reasonably concluded that such testing could be inculpatory and that the better strategy was to challenge the lack of physical evidence linking Petitioner to the crime and the quality of the police investigation. Counsel's strategic decision is "due a heavy measure of deference." *Cullen*, 131 S. Ct. at 1407. Moreover, Petitioner has not shown that any such tests would have exonerated him or otherwise benefitted his defense. His conclusory allegations are insufficient to demonstrate prejudice. *See, e.g., Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007) (conclusory allegations are insufficient to justify habeas relief); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide a basis for evidentiary hearing on habeas review). Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard.

Petitioner asserts that trial counsel was ineffective for failing to sufficiently communicate with him. The record indicates that counsel met with Petitioner before trial and consulted with him during trial. The record further indicates that counsel reviewed the file, questioned witnesses about their version of events, and advocated Petitioner's case. The mere fact that counsel may have spent little time with Petitioner prior to trial "is not enough under *Strickland*, without evidence of prejudice or other defects." *Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003); *accord Lenz v. Washington*, 444 F.3d 295, 303 (4th Cir. 2006) (petitioner could not prevail on claim that attorneys were ineffective due to infrequent pre-trial visits where he failed to show resulting prejudice); *Anderson v. Calderon*, 232 F.3d 1053, 1086 (9th Cir. 2000) (same). Petitioner has not explained with any specificity how additional meetings with counsel would have benefitted his defense.

Petitioner relatedly asserts that trial counsel was deficient for failing to investigate his case, interview witnesses, and prepare a defense. Well-established federal law requires that defense counsel conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning . . . guilt or innocence." *Towns*, 395 F.3d 251 at 258. "A purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them." *Id.* (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)); *see also Wiggins*, 539 U.S. at 526

That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. When making such strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-23. The failure to present evidence or call witnesses constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Petitioner has not shown that trial counsel erred or that he was prejudiced by counsel's conduct. The record indicates that counsel consulted with Petitioner during the proceedings, sufficiently investigated the case, and prepared for trial. Petitioner was not deprived of a substantial defense. Although Petitioner asserts that counsel should have interviewed additional witnesses and produced further evidence at trial, he has not provided witness names, witness

affidavits to establish their ability and willingness to testify, and/or the substance of their potential testimony. As noted, conclusory allegations are insufficient to establish that counsel was ineffective, *Cross*, 238 F. App'x at 39-40; *Workman*, 178 F.3d at 771, or to justify an evidentiary hearing on this issue. *Washington*, 455 F.3d at 733. Petitioner has not established that trial counsel was ineffective.

Petitioner also asserts that trial counsel was deficient for failing to raise "pertinent" issues. The state court record belies this claim. The record indicates that trial counsel raised several issues at Petitioner's request during the proceedings, objected to holding the preliminary examination in Petitioner's absence, objected to a later adjournment request, raised speedy trial issues before the trial court, and challenged the prosecution's case throughout the trial. Such actions were reasonable and in keeping with professional norms. While Petitioner alleges that counsel was unprepared, lied, and sabotaged his case, such allegations are conclusory and unsupported by the record. Petitioner has not alleged facts to show what more trial counsel could have done which would have benefitted his defense or affected the outcome at trial. He has thus failed to establish that trial counsel was ineffective under the *Strickland* standard.

Petitioner further asserts that appellate counsel was ineffective for failing to raise the issues raised in his motion for relief from judgment on direct appeal in the state courts. As explained *supra* and *infra*, those claims lack merit and the trial court ruled as such in denying relief on collateral review. Consequently, Petitioner cannot establish that appellate counsel was ineffective under the *Strickland* standard. Appellate counsel cannot be deemed ineffective for failing to raise non-meritorious issues. *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010). Habeas relief is not warranted.

### E.    Sufficiency of the Evidence

24

Petitioner asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his convictions – namely that he was the perpetrator of the crime. Respondent contends that this claim is barred by procedural default and lacks merit.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted). A federal court may not re-weigh the evidence or redetermine the credibility of the witnesses. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). "It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992)). A habeas court must defer to the factfinder for its assessment of the credibility of witnesses. *Id.*

The sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Jackson*, 443 U.S. at 324 n. 16, and through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Under Michigan law, the elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which if successful, would make the killing murder.

25

*Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (citing Michigan law); *People v. Ericksen*, 288 Mich. App. 192, 195, 793 N.W.2d 120 (2010); MICH. COMP. LAWS § 750.83. The elements of first-degree home invasion are: (1) that the defendant either broke and entered a dwelling or entered a dwelling without permission, (2) that defendant either intended when entering to commit a felony, larceny, or assault in the dwelling or at any time when entering, present in, or exiting the dwelling committed a felony, larceny, or assault; and (3) while the defendant was entering, present in, or exiting the dwelling either the defendant was armed with a dangerous weapon or another person was lawfully present in the dwelling. *People v. Wilder*, 485 Mich. 35, 43, 780 N.W.2d 265 (2010); MICH. COMP. LAWS § 750.110a(2). The elements of assault with intent to commit sexual penetration are: (1) an assault, and (2) an intent to commit criminal sexual conduct involving sexual penetration. *People v. Nickens*, 470 Mich. 622, 627, 685 N.W.2d 657 (2004); MICH. COMP. LAWS § 750.520g(1).

Additionally, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense. *People v. Oliphant*, 399 Mich. 472, 489, 250 N.W.2d 443 (1976); *People v. Yost*, 278 Mich. App. 341, 356, 749 N.W.2d 753 (2008); *People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216 (1967). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *People v. Nowack*, 462 Mich. 392, 399-400, 614 N.W.2d 78 (2000); *People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the identity of the perpetrator, *Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002); *Kern*, 6 Mich. App. at 409.

On collateral review, the trial court noted that Petitioner left his keys in the victim's apartment and that the victim and her two roommates identified him as the perpetrator, stated that

26

the "evidence was overwhelming," and denied relief on this claim. *Aaron*, No. 2005 203022 FC at *3. The Michigan appellate courts denied leave to appeal.

The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[5] The victim's testimony, if believed, provided sufficient evidence of Petitioner's guilt at trial. A victim's testimony alone can be constitutionally sufficient to sustain a conviction. *See Tucker v. Palmer*, 541 F.3d 652, 658 (6th Cir. 2008) (citing cases). Additionally, the prosecution presented testimony from the victim's roommates identifying Petitioner as the man they saw fleeing the apartment at the time of the assault. The police recovered keys fitting Petitioner's old apartment lock in the victim's apartment. Petitioner also left Michigan after the incident in violation of his parole. Such evidence was sufficient to establish that Petitioner was the perpetrator and support his convictions.

Petitioner challenges the credibility of the witnesses and the jury's evaluation of the evidence presented at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *Jackson*, 443 U.S. at 326; *Martin*, 280 F.3d at 618; *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict was reasonable. The evidence presented at trial, viewed in a light favorable to the prosecution, established beyond a reasonable doubt that Petitioner committed the charged offenses. Habeas relief is not warranted on this claim.

**F.      Conduct of the Prosecutor**

---

[5]The Court would reach the same result under a *de novo* standard of review.

2:11-cv-11147-VAR-LJM   Doc # 9   Filed 11/26/13   Pg 28 of 32   Pg ID 1228

Petitioner asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct by vouching for the credibility of prosecution witnesses, delaying the disclosure of evidence, and using certain witnesses' immigration status to coerce their testimony.  Respondent contends that this claim is barred by procedural default and lacks merit.

The United States Supreme Court stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly*); *Parker v. Matthews*, _ U.S. _, 132 S. Ct. 2148, 2153 (2012) (confirming that *Donnelly/Darden* is the proper standard).

On collateral review, the trial court stated that defense counsel established that the witnesses were in the country illegally, found "no evidence that the prosecutor used the witnesses' immigration status to coerce their testimony," and denied relief on this claim.  *Aaron*, No. 2005 203022 FC at *3.  The Michigan appellate courts denied leave to appeal.

The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[6]  Petitioner asserts that the prosecutor improperly vouched for witnesses.  It is well-settled that it is improper for a prosecutor to express his or her own personal opinions as to a witness's credibility.  *United States v. Young*, 470 U.S. 1, 9-10 (1985); *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005); *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002).  Such statements are improper because they can convey the impression that the prosecutor has evidence not presented to the jury which supports the charges

---

[6]The Court would reach the same result under a *de novo* standard of review.

against the defendant thereby infringing upon the defendant's right to be judged solely based upon the evidence presented and because the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own. *Young*, 470 U.S. at 18-19; *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008); *see also Wilson v. Bell*, 368 F. App'x 627, 633 (6th Cir. 2010) (citing cases).

The prosecutor in this case did not improperly vouch for the credibility of prosecution witnesses. Rather, he argued that those witnesses should be believed based upon the substance of their testimony, their demeanor, and the other evidence presented at trial. It is well-established that a prosecutor may argue reasonable inferences from the evidence, *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000), and may argue from the facts that a witness is or is not worthy of belief. *Portuondo v. Agard*, 529 U.S. 61, 69 (2000). The prosecutor did not imply that he had personal knowledge or undisclosed evidence of guilt. Petitioner fails to show that the prosecutor's comments were improper or that they deprived him of a fundamentally fair trial.

Petitioner also asserts that the prosecutor delayed disclosing evidence until a few weeks before trial. There is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To find a *Brady* violation, not only must the evidence be suppressed, it must be material and favorable to the accused. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432–36 (1995).

29

Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993). The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley, supra*; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). The petitioner bears the burden of establishing a *Brady* violation. *Id*.

Petitioner has not met his burden. He fails to explain what evidence was withheld until "just weeks before trial" and fails to allege or establish that he was prejudiced by the delayed disclosure. As discussed, *supra*, conclusory allegations are insufficient to warrant habeas relief. *Cross*, 238 F. App'x at 39-40; *Workman*, 178 F.3d at 771. Petitioner has not shown that the prosecutor committed a *Brady* violation or otherwise engaged in misconduct.

Finally, Petitioner claims that the prosecutor coerced witnesses to testify based upon their immigration status. Again, Petitioner fails to allege any facts to support such a claim or overcome the trial court's finding that no such coercion occurred. His conclusory allegations of improper conduct are insufficient to warrant habeas relief. *Id.* Petitioner fails to demonstrate that the

30

prosecutor engaged in misconduct which deprived him of a fundamentally fair trial. Habeas relief is not warranted on this claim.

## V.    Conclusion

The Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition. Accordingly, the Court **DENIES WITH PREJUDICE** the Petition for a Writ of Habeas Corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability is warranted only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits. *Id*. at 336-37.

Having considered the matter, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, the Court **DENIES** a certificate of appealability. The Court also **DENIES** leave to proceed *in forma pauperis* on appeal; an appeal cannot be taken in good faith. FED. R. APP. P. 24(a). This case is closed.

**IT IS SO ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  November 26, 2013

The undersigned certifies that a copy of this document was served on the attorneys of record and Jeffrey Aaron  by electronic means or U.S. Mail on November 26, 2013.

S/Carol A. Pinegar
Deputy Clerk